# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 1, 2016

## STATE OF TENNESSEE v. DAVID BANKS

**Appeal from the Criminal Court for Shelby County**
**No. 13-02626          Paula L. Skahan, Judge**
_____

**No. W2016-00173-CCA-R3-CD  -  Filed February 24, 2017**
_____

A jury convicted the Defendant, David Banks, of attempted rape of a child, a Class B felony; two counts of aggravated sexual battery, Class B felonies; and one count of child abuse, a Class A misdemeanor, for crimes he committed against two child victims. The Defendant appeals, asserting that the evidence is insufficient to support the verdicts. The Defendant also asserts that the trial court erred in refusing to permit an employee of the Department of Children's Services ("DCS") to testify regarding a note she had written which stated that one of the victims had manifested behavioral issues, including lying. Because the evidence was sufficient to allow a rational trier of fact to convict the Defendant and because there was no error in the exclusion of the evidence, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Stephen Bush, District Public Defender; and Harry E. Sayle III (on appeal) and Kamilah E. Turner (at trial), Assistant District Public Defenders, for the appellant, David Banks.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Joshua N. Corman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant's crimes came to light when Victim 1[1] revealed that the Defendant had sexually abused her from age nine to age thirteen. Victim 1 also revealed that her best friend, Victim 2, had been involved in some of the abuse. The Defendant was consequently charged with rape of a child and aggravated sexual battery for crimes committed against Victim 1 while she was between nine and twelve years old. He was also charged with rape of a child and aggravated sexual battery for crimes committed against Victim 2 between 2011 and 2012, when Victim 2 was twelve years old. The Defendant was charged with rape and sexual battery for crimes committed against Victim 1 after she had turned thirteen.

Victim 1 lived with her mother, her mentally disabled older brother, and two younger brothers. Victim 1's mother had a very close friend, and this friend was the girlfriend and, later, wife of the Defendant.[2] Victim 1 described the Defendant's wife as like an aunt to her and as a "play sister" to her mother. When Victim 1 was nine years old, she and her family lived briefly with the Defendant and his wife at an apartment. Prior to the abuse, Victim 1 thought the Defendant was "cool" because he would let the children curse.

One evening when Victim 1 was nine years old, Victim 1's mother and the Defendant's wife went to the grocery store and left the Defendant at home with Victim 1. Victim 1 was just getting out of the bathtub when the Defendant came into the bathroom and asked her if she wanted "to learn some things." Thinking it was "something that you need to know or something that you should learn" she said yes and followed the Defendant to his wife's room wearing her towel. The Defendant then showed her a pornographic movie. Victim 1 testified that the Defendant touched her vagina and breasts with his hand and that he touched her vagina with his mouth. During this encounter, the Defendant told Victim 1 that "something would happen to [her]" if she told. She testified that the Defendant had sexual contact with her "many times," including times when he performed cunnilingus in his car.

Victim 1's family lived in a duplex when she was in the fifth and sixth grade. The Defendant first had intercourse with Victim 1 when she was in sixth grade. Victim 1 testified that the Defendant had determined that she was "old enough for him to stick his

---

[1] It is the policy of this court not to reveal the identity of minor victims of crimes.

[2] It is not clear when the two married, but for the sake of clarity, we will refer to this friend of Victim 1's mother as "the Defendant's wife" throughout.

penis inside of my vagina." Victim 1 recalled that she was home from school because she had been suspended for fighting. Victim 1's mother was trying to get to work but had a flat tire, and the Defendant came to assist with the tire. Victim 1 rode with the Defendant and her mother to a gas station, and while she was there, she asked the Defendant to buy her some chips. The Defendant bought them and told her she would have to "repay him for the chips." When they returned to Victim 1's home, Victim 1 was lying on her bed and the Defendant began to fondle her. He then raped her on the floor. Victim 1 testified that she had sexual intercourse twice with the Defendant.

Victim 1 also testified about an incident in the bedroom which she shared with her brothers when she was in the fifth or sixth grade. Victim 1 testified that she and her disabled brother were cleaning the room. The Defendant went into the closet where Victim 1 was working and "went and stuck his penis."[3]

Victim 1 testified that her elementary school only went through the sixth grade, after which she attended Memphis Academy of Science and Engineering. The prosecutor asked Victim 1 her date of birth at the very beginning of her testimony. However, the prosecutor never elicited testimony from her regarding how old she was at the time that the Defendant first had intercourse with her, during the time when she was suspended from school. Moreover, the prosecutor had elicited testimony that this rape occurred when Victim 1 was in sixth grade, but he also asked Victim 1 whether she had turned thirteen when she was in elementary school, to which she responded in the affirmative. Other evidence shows, however, that Victim 1 turned twelve in October of her sixth grade year, which was her last year at elementary school. Accordingly, the jury was presented with evidence from which it could be calculated that Victim 1 turned twelve in October of 2010, during her sixth grade year. However, Victim 1 had also agreed to the prosecutor's suggestion that she turned thirteen in elementary school, and she testified that elementary school ended with the sixth grade.

Victim 1 next testified about the incidents involving Victim 2, Victim 1, and the Defendant. When Victim 1 was in sixth grade, her best friend was Victim 2, and the two would visit each other and spend the night at each other's homes. Victim 2 met the Defendant at a barbeque at Victim 1's house, and Victim 1 told Victim 2 that the Defendant was "cool" because he would let them do "whatever we want" but also told her, "don't get too close to him because he does things to me."

Victim 1 testified that the Defendant frequently came to the house when her mother was at work and that one time he was there when Victim 2 was spending the

---

[3] The written transcript of Victim 1's testimony does not reveal anything more about what occurred, and the prosecution did not elect to rely on this incident.

night. She testified that she and Victim 2 were in the children's room when the Defendant came in and sat on her little brother's bed, eating soup. The Defendant asked the two girls to kiss each other and to touch him. He also touched them on their buttocks and vaginas. Victim 2 responded by slapping the Defendant, and he called her a "b*tch" but stopped touching the girls.

Another time, Victim 2 was visiting Victim 1, and the two girls were in Victim 1's mother's room. Victim 1 stated that the Defendant had told her developmentally disabled brother to go listen to music and that she did not recall where her younger brothers were. The Defendant forced Victim 1 and Victim 2 to touch each other's vaginas and kiss each other. The Defendant also touched Victim 1's buttocks. He pulled down his pants and masturbated, and he made both girls touch his penis. He also attempted to perform oral sex on Victim 2, but she stopped him. The Defendant ejaculated on the floor and cleaned it with a towel. Victim 1 testified that she did not recall if he attempted any other sexual act on either girl that time.

Victim 1 testified that when the Defendant got married, he told her that she should tell him "no" the next time he tried to have sexual contact with her. When she told him "no," however, he shook her and hit her. Victim 1 was afraid of the Defendant.

At the end of November 2012, Victim 1 was spending the night with her father's sister, whom she considered a second mother. Victim 1 wrote her aunt a letter stating that the Defendant had been raping her, and she left it on her aunt's bed. Victim 1 testified that she told her aunt about the abuse because "[i]t was eating me up[] and I just wanted to … get justice for it," and that the thought of the abuse was making her want to hurt herself. Victim 1's aunt and Victim 1 both cried. Victim 1's aunt called Victim 1's mother and father and the police. Due to the disclosures in the letter, Victim 1's father and her aunt called Victim 2. At this point, Victim 1 was "just tired of living with the pain and things like that, just the thought of it just running through my head," and she suffered from "flashbacks, sleepless nights." Victim 1 attempted to commit suicide by eating peanut butter, to which she had an allergy. She was checked into a mental health facility and was not interviewed by the Child Advocacy Center ("CAC") until after her treatment there.

Victim 1 acknowledged on cross-examination that she had initially thought the first encounter with the Defendant was at a different apartment complex, but she explained that her family moved numerous times and that she had just been confused regarding the location. She also acknowledged that she and Victim 2 got into trouble together, explaining that if one was in a fight, the other would join. Both girls were expelled from middle school in seventh grade. Victim 1 testified that she and Victim 2 were dating at one point and that when her mother found out that they were romantically

- 4 -

involved, her mother forbid her from seeing Victim 2. Victim 1 acknowledged that she did not tell about the Defendant's abuse until after her mother had forbidden her to see Victim 2. However, she testified that Victim 2 had always wanted her to tell about the abuse and that Victim 2 "encouraged me even more when … we stopped seeing each other."

Victim 2 testified that she turned twelve in early June after her sixth grade year and that she and Victim 1 were best friends in sixth grade. Victim 2 confirmed that she met the Defendant at a barbeque at Victim 1's home in the summer after she completed sixth grade. She thought that the Defendant was "cool," but Victim 1 warned her not to "get too close to him." Victim 2 "never understood why until the situation took place." Victim 2 recalled one instance when Victim 2 spent the night while Victim 1's mother was absent. Victim 2 was sitting in the living room while Victim 1 was in the bedroom, and the Defendant went into the bedroom with Victim 1. After the Defendant left, Victim 1 "had an attitude," but Victim 2 did not know why.

Victim 2 recalled the time the Defendant assaulted her in Victim 1's bedroom. She stated that she and Victim 1 were lying on Victim 1's bed and the Defendant came in, eating soup out of a blue bowl. The Defendant tried to gain their trust by commenting on their appearance, and he then told the girls to engage in sexual contact with one another. Victim 2 testified that she kissed Victim 1. The Defendant then tried to pull down her black and gray gym shorts. He took his penis out of his pants, and it went into her gym shorts and came in contact with her vagina, although he did not penetrate her vagina. Victim 2 hit the Defendant, and he called her a "b*tch" but did not further assault her.

Victim 2's testimony regarding the encounter with the Defendant in Victim 1's mother's bedroom was generally consistent with Victim 1's testimony. Victim 2 testified that the Defendant told Victim 1's older brother to listen to music and told Victim 1's younger brothers, who were approximately six and one, to watch television in another room. Victim 1's mother was at work. The Defendant then came to Victim 1's mother's bedroom with the girls. The door had been wide open, and the Defendant left it cracked. He again told the girls to engage in sexual contact with one another. Victim 2 kissed Victim 1, and the Defendant pulled his pants halfway down and masturbated. He then told both girls to touch his penis, and both did. He also tried to perform oral sex on Victim 2, but she was able to get away from him. The Defendant ejaculated on the floor and cleaned it with a towel.

Victim 1 was scared to tell anyone about these incidents, and she begged Victim 2 not to tell. Victim 2 thought that her mother would be mad because Victim 2 "actually did the things that he asked me to do. So I thought I was in the wrong. I knew he was in

the wrong, but I thought I was wrong, too." She asked Victim 1 to tell someone, but when Victim 1 insisted on keeping it a secret, she acquiesced.

Victim 2 confirmed that Victim 1's father and aunt called her in November 2012 and asked if she knew what had been happening between the Defendant and Victim 1 and whether she was involved. Victim 2 told them that she was. Victim 2 stated that Victim 1's father spoke to Victim 2's mother. The police came to Victim 2's house. She acknowledged that she and her mother both did not want to speak about the incidents to authorities and explained that she found the situation embarrassing.

Victim 2 acknowledged that she had been dating Victim 1 and that they were forbidden to see each other at one point. She also acknowledged that, in her interview with the CAC, she had denied ever touching Victim 1 or touching the Defendant's penis. She testified that she was young at the time of the interview, was embarrassed, and just wanted the case to be finished. She stated that she now felt that "the truth should come out."

Victim 1's father and aunt also testified regarding Victim 1's disclosure of the abuse. Victim 1's father stated that he had always maintained a close relationship with Victim 1, seeing her more than once a week, although he and Victim 1's mother were no longer in a relationship and he had never been her custodial parent. He testified that he also had a good relationship with Victim 2, who called him "Dad" at the time. He had not seen Victim 2 since he found out about the abuse. Victim 1's father was living with his sister at the time of the disclosure, and she called him to come to home after she had read Victim 1's letter. Victim 1 was sad, crying, and did not want to make eye contact or discuss the events. He testified that she seemed "terrified." Victim 1's father called Victim 1's mother, the police, and Victim 2 and her mother. He acknowledged that while he had testified that there were never custody issues with Victim 1, there actually was a formal schedule of visitation, but he explained that he and Victim 1's mother were friendly and that she would allow him to see Victim 1 at any time regardless of the schedule. Victim 1's father was slightly acquainted with the Defendant.

Victim 1's aunt also confirmed Victim 1's testimony regarding revealing the abuse. She stated that Victim 1 had put a note on the bed where she and her husband were lying down. After Victim 1's aunt read the first few lines, she woke her husband. She testified that Victim 1 always had trouble sleeping, and that the note attributed her trouble sleeping to the Defendant's long-term molestation. Victim 1's aunt called Victim 1's father, and the two called the police. Victim 1 was upset and crying. Victim 1's father and aunt called Victim 2, and Victim 1's aunt tried to assure both girls that it was not their fault. She also tried to convince Victim 1's father, who was very angry at the Defendant, to let the authorities handle the matter. Victim 1's aunt testified that Victim

1's family had lived with the Defendant and his wife at one point, and she also stated that the Defendant and his wife had at one point lived with Victim 1's family in the duplex they occupied when she was in the fifth and sixth grade. She was not aware that Victim 2 and Victim 1 had been dating or that Victim 1's mother had forbidden her to see Victim 2.

Prior to the defense proof, the State elected to dismiss the two counts charging the Defendant with rape and sexual battery for crimes committed against Victim 1 after she turned thirteen. The prosecutor stated that he was afraid the indictment would be confusing to the jury because the time periods in the separate counts related to Victim 1's birthday rather than to the dates that the offenses had taken place.[4] The State also noted that it did not believe Victim 2's testimony had established the offense of rape of a child, and the prosecutor requested the trial court to reduce the charge of rape of a child related to the offense against Victim 2 to attempted rape of a child.

The defense called Jane Cain, an employee of the DCS, to testify regarding a note she had written referring Victim 1 to the CAC for counseling. The prosecutor objected to the testimony on the basis that Ms. Cain could not give an opinion on Victim 1's veracity and that her testimony would not fall within the parameters of Tennessee Rule of Evidence 608.

The trial court permitted the defense to make an offer of proof. During the offer of proof, Ms. Cain testified that, in her referral written in March 2013, she had written that "the child has behavior issues, fighting, disrespect for authority figures, and lying." Ms. Cain testified that she wrote the referral for counseling after speaking with Victim 1, Victim 1's mother, and the principal and assistant principal of the school. Ms. Cain's testimony was ultimately that she did not recall why she had put that Victim 1's conduct was characterized by "lying." Ms. Cain testified that what she put in the referral would have been based on information that she got from the persons she interviewed. She recalled that Victim 1 had told her that the principal at the school was "mean," while the principal told her that Victim 1 would often talk to him, but she did not recall if the note regarding lying was based on this discrepancy. She testified that she could not "pinpoint" anything that had made her write it down. She disagreed that it had been her "opinion that [Victim 1] had an issue with lying." Ms. Cain testified that she could not recall the

---

[4] The indictments related to Victim 2 were amended prior to the beginning of trial to reflect the fact that the offenses against Victim 2 took place during the summer of 2011. The Defendant did not object to this amendment and the court granted the motion to amend. *See State v. Stokes*, 24 S.W.3d 303, 306-07 (Tenn. 2000) (noting that an indictment may be amended with the defendant's oral or written consent).

reason she wrote the sentence but that it must have been "because of something that had been said or had not been said or that I had not seen earlier."

The trial court excluded the testimony. The court noted that Ms. Cain did not testify regarding Victim 1's reputation for truthfulness. The trial court stated that "the probative value [of the evidence] must be supported by specific facts and circumstances which substantially outweigh its prejudicial effect. And I do not find that to be the situation here." The court noted that the testimony was neither opinion nor reputation testimony under Tennessee Rule of Evidence 608, and that Ms. Cain had no personal knowledge either of Victim 1's behavior or of her reputation. The court further concluded that the evidence would not be relevant under Tennessee Rule of Evidence 403. After Ms. Cain's testimony was excluded, the defense introduced no further proof.

The prosecution elected offenses prior to the trial court instructing the jury. For the offenses against Victim 1, the State elected to rely on Victim 1's testimony regarding the rape on the floor of her room when she was suspended from school in the sixth grade for the rape of a child charge in Count 1. The State elected to rely on Victim 1's description of the Defendant's first encounter with her when she was nine years old and had just gotten out of the tub for the aggravated sexual battery charge, noting during closing argument that Victim 1's description would also establish rape of a child for that offense but that the jury should consider only the offense of aggravated sexual battery. For the offenses against Victim 2, the prosecutor elected to establish attempted rape of a child based on Victim 2's testimony that the Defendant put his penis into her gym shorts and that she was able to stop him by hitting him. The prosecutor elected to rely on Victim 2's testimony that she touched the Defendant's penis in Victim 1's mother's room for the aggravated sexual battery charge related to the Defendant's crimes against Victim 2.

During deliberations, the jury sent out the following question: "We, the jury, would like to request a transcript with regards to [Victim 1]'s testimony at the time of the count one incident." The trial court informed the jury that no transcripts were available.

The jury was charged in Count 1 with rape of a child against Victim 1 and with two lesser-included offenses: attempted rape of a child and child abuse. The jury returned a verdict finding the Defendant guilty of child abuse in Count 1. The jury convicted the Defendant as charged in the remaining counts of attempted rape of a child committed against Victim 2, of aggravated sexual battery committed against Victim 1, and of aggravated sexual battery committed against Victim 2

The trial court sentenced the Defendant to eleven months and twenty-nine days for the child abuse conviction, to twelve years for the attempted rape of a child conviction

and to twelve years for each aggravated sexual battery conviction. The trial court ordered the offenses against Victim 1 to run concurrently with one another and the offenses against Victim 2 to run concurrently with one another, but ordered the two aggravated sexual battery convictions to run consecutively for an effective sentence of twenty-four years with a one hundred percent release eligibility date. On appeal, the Defendant challenges the sufficiency of the evidence and the trial court's decision to exclude Ms. Cain's testimony.

## ANALYSIS

## I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions because the evidence of the offenses came only from the victims. The Defendant also argues that the credibility of Victim 1 should have been challenged via Ms. Cain's testimony and that Victim 2's testimony is not credible because it was not consistent with her statement to the CAC. He also challenges their credibility based on the timing of the disclosures.

Tennessee Rule of Appellate Procedure 13(e) requires a finding of guilt to be set aside if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. The question before the appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). When the defendant challenges the sufficiency of the evidence, the appellate court may not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). Instead, the jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013).

The State presented the testimony of Victim 1 that the Defendant raped her on the floor of her bedroom when she was in the sixth grade. The proof included evidence that

Victim 1 exhibited behavioral issues and ultimately tried to kill herself due to the assault. Victim 1 also testified that the Defendant touched her intimate parts when she was nine years old and had been left alone with him while her mother went to the grocery store. Victim 2 testified that she touched the Defendant's intimate parts in Victim 1's mother's bedroom when she was twelve years old and that he then ejaculated. Victim 2 also testified that the Defendant put his penis into her gym shorts against her vagina when she was twelve but that she hit him and he did not penetrate her.

The Defendant does not contend that the State failed to prove the elements of the offenses. Instead, his argument is essentially a challenge to the credibility of the victims. However, questions regarding the credibility of witnesses are entrusted to the jury. *Bland*, 958 S.W.2d at 659. "Generally, a defendant may be convicted upon the uncorroborated testimony of one witness." *State v. Wyrick*, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). "[T]he testimony of a child victim, alone, is sufficient to uphold a conviction for child rape." *State v. Phillip Smith*, No. W2013-02280-CCA-R3-CD, 2014 WL 4072113, at \*7 (Tenn. Crim. App. Aug. 18, 2014). While Victim 2's testimony at trial differed from her statement at the CAC, the Defendant was given the opportunity to cross-examine her about the inconsistencies, and she explained that she had been embarrassed and was reluctant to tell the truth when the police first approached her. The Defendant was able to establish the timing of the disclosures and allow the jury to consider it for any probative value. Because credibility is an issue for the jury's determination, inconsistencies in a witness's testimony do not merit relief on appeal unless they are "'so improbable or unsatisfactory as to create a reasonable doubt of the [Defendant's] guilt.'" *State v. Elkins*, 102 S.W.3d 578, 583 (Tenn. 2003) (quoting *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). That is not the case here. The two victims presented largely consistent testimony regarding the Defendant's attacks. The jury chose not to accredit the Defendant's theory that they had invented the crimes in an attempt to induce their mothers to allow them to spend more time together. We conclude that the evidence is sufficient to uphold the verdicts.

## II. Testimony Excluded Under Tennessee Rule of Evidence 608

The Defendant asserts that the trial court erred in excluding the testimony of Ms. Cain. The Defendant argues that the decision amounted to an abuse of discretion because the trial court applied the incorrect legal standard in analyzing the statement's admissibility. Questions regarding the admissibility of evidence are generally within the discretion of the trial court. *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010). A trial court abuses its discretion by applying an incorrect legal standard or making a ruling that is illogical or unreasonable and causes an injustice to the complaining party. *Id.*

Tennessee Rule of Evidence 404(a) states that evidence of a person's character or trait is not admissible to prove conduct in conformity with the trait. One exception to character evidence is governed by Tennessee Rule of Evidence 608. *See* Tenn. R. Evid. 404(a)(3) (noting that character evidence may come in as provided by Rules 607, 608, and 609).

Tennessee Rule of Evidence 608 allows for the admission of certain evidence pertinent to a witness's truthfulness. Rule 608(a) permits the credibility of a witness to be challenged "by evidence in the form of opinion or reputation," so long as the evidence refers "only to character for truthfulness or untruthfulness." Tenn. R. Evid. 608(a)(1). Specific instances of conduct relevant to truthfulness may also be brought out on cross-examination. Tenn. R. Evid. 608(b). The court must hold a hearing outside the jury's presence to determine whether the conduct has probative value and whether there is a reasonable factual basis for inquiring into the conduct. Tenn. R. Evid. 608(b)(1). Furthermore, conduct which occurred more than ten years before the commencement of prosecution is admissible only with notice and a judicial determination "in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Tenn. R. Evid. 608(b)(2).

Evidence under Rule 608(a) requires a proper foundation. The nature of the evidence determines the foundation. Evidence regarding a witness's reputation for truthfulness must be preceded by the character witness showing "such acquaintance with the [person under attack], the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded." *State v. Dutton*, 896 S.W.2d 114, 118 (Tenn. 1995) (citations omitted). This is because the testimony should accurately reflect the community's assessment of the challenged witness's character. *Id.*

Rule 608(a) allows not only reputation but also opinion testimony. An opinion about a witness's character for truthfulness may be admitted after the character witness has established that he or she is "'sufficiently personally familiar with [the primary witness's] character to offer an opinion on the subject.'" *Dutton*, 896 S.W.2d at 118 (quoting Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 608.2 (2nd ed. 1990)). The character witness who offers an opinion about the primary witness's character for truthfulness must testify from personal knowledge. *Id.* "[I]t is necessary to demonstrate 'that the opinion is rationally based on the perception of the witness and would be helpful to the jury in determining the fact of credibility.'" *Id.* (quoting *United States v. Dotson*, 799 F.2d 189, 193 (5th Cir. 1986)).

When the defense attempted to introduce Ms. Cain's testimony, the State objected, arguing that her testimony would not be relevant because she would be testifying to an

issue that should be left to the jury. The parties and trial court narrowed the issue to the statement in the note Ms. Cain wrote in her referral to the CAC in which Ms. Cain stated that Victim 1 had behavioral issues, including "lying." The prosecution argued that the information was hearsay because Ms. Cain was merely summarizing information from other parties.

Ms. Cain testified that the purpose of her note was to give the recipient some information to assist in counseling the child. She testified that the information would have come from the interviews she conducted with Victim 1, Victim 1's mother, and school personnel. Ms. Cain's testimony was that she had no recollection of the reason that she wrote that Victim 1 had issues with "lying." She testified that she could not "pinpoint" anything that had made her write it down. When asked if her opinion was that Victim 1 had an issue with lying, she stated, "I can't say that. No."

The trial court excluded the evidence. The judge noted that, if Ms. Cain had testified that she had spoken to numerous people in the community who had told her that Victim 1 "never told the truth," then the court would have admitted the evidence as reputation evidence. The trial court then stated the evidence was not relevant under Rule 403. The trial court went on to note that under Rule 608, specific instances of conduct would be admissible but that "the probative value must be supported by specific facts and circumstances which substantially outweigh its prejudicial effect." Defense counsel then redirected the trial court by specifying that she was arguing for admission under Rule 608(a) governing opinion and reputation and not Rule 608(b) governing specific instances of conduct. The trial court then analyzed the evidence under Rule 608(a) and found that Ms. Cain did not know the victim, "was not somebody from her neighborhood," and could not cite any specific source for the information. The trial court ruled that Ms. Cain could not testify about the note.

The Defendant asserts that the trial court attempted to analyze Ms. Cain's testimony under the provision of the Rule addressing reputation evidence rather than opinion evidence, and he asserts this was error. However, the record shows that the trial court properly examined whether an adequate foundation had been laid for the admission of either opinion or reputation testimony. The trial court found that Ms. Cain, who testified that she only had a brief interaction with Victim 1 and that she did not have any personal experience which would indicate that Victim 1 was lying, could not properly give an opinion on Victim 1's character for truthfulness. Because the defense did not show that she was "sufficiently personally familiar" with Victim 1's character, this ruling was correct. *See Dutton*, 896 S.W.2d at 118 (quotation omitted). The trial court also explored and rejected the possibility that the testimony could come in as reputation testimony. In doing so, the trial court found that Ms. Cain had spoken to a very limited number of people in the community, that she "was not somebody from [Victim 1's]

neighborhood," and that she had not otherwise testified that she knew Victim 1 by reputation. Furthermore, she did not testify that others in the community thought Victim 1 was untruthful and could not remember what had made her write the note. The defense did not show that Ms. Cain was so familiar with Victim 1 or her community "as to speak with authority of the terms in which generally [s]he is regarded." *Id.* (quotation omitted). Accordingly, the trial court properly excluded the testimony.

The Defendant also asserts that the trial court applied an incorrect legal standard in excluding the evidence under Tennessee Rule of Evidence 403. The Defendant points to the trial court's statement that the probative value of the testimony must be supported by specific facts and circumstances which substantially outweigh its prejudicial effect, which he asserts is the improper standard, since Rule 403 allows evidence to come in unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. However, the State correctly notes that the trial court was reciting the standard for excluding evidence of specific instances of conduct under Rule 608(b). When the Defendant pointed out that he was seeking admission of the evidence under Rule 608(a), the trial court reiterated its analysis that the foundation had not been laid for either opinion or reputation testimony. We conclude that the trial court did not apply an incorrect legal standard when it concluded that the character evidence was not admissible under Rule 608(a). Because the trial court correctly found that the evidence was inadmissible character evidence, *see* Tenn. R. Evid. 404(a), we do not examine the ruling finding that the evidence was not relevant. We conclude that the trial court did not abuse its discretion in excluding the evidence.

## CONCLUSION

Because the evidence is sufficient to uphold the verdict and because Ms. Cain's testimony was properly excluded, we conclude there was no error and affirm the judgments of the trial court.


_____
JOHN EVERETT WILLIAMS, JUDGE


- 13 -